FILED
COURT OF APPEALS
DIVISION II

2014 AUG 12 PM 12: 46

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| GENERAL CONSTRUCTION CO., | No. 44402-0-II |
| Appellant, | |
| v. | |
| DAY ISLAND YACHT HARBOR, INC., | UNPUBLISHED OPINION |
| Respondent. | |

HUNT, P.J. — General Construction Company appeals a $1.25 million jury verdict based on its finding that General Construction breached its construction contract with Day Island Yacht Harbor, Inc. General Construction argues that (1) the trial court erred as a matter of law in admitting Brian McGuire's testimony about the value of his marina, (2) the jury verdict lacked substantial supporting evidence, and (3) the trial court erred in denying General Construction's motion for new trial for these foregoing two reasons and also because (a) the verdict did not "do substantial justice" and (b) the trial court improperly ruled that General Construction waived its right to challenge McGuire's opinion testimony about the diminution in value of his marina. Br. of Appellant at 37. We affirm.

## FACTS

### I. MARINE CONSTRUCTION CONTRACT

Day Island Yacht Harbor, Inc. is a Washington corporation, which Brian McGuire acquired in 1970. Beginning in 1988, Day Island contracted with General Construction, a construction company specializing in marine-related construction work, whenever Day Island needed piling replaced or other marine construction work.

On May 20, 2008, Day Island and General Construction entered into a construction agreement for dredging and piling work at Day Island Yacht Harbor, for an agreed price in excess of $800,000. The agreement provided that General Construction would furnish the necessary personnel, equipment, and facilities for the project and that its duties included (1) mobilizing and demobilizing cranes, anchors, buckers, and material barges; (2) demolishing float piles; (3) moving the floats and boathouses to temporary anchorage; (4) dredging ("all work to clamshell dredge into small barges"); (5) driving new piles; and (6) installing long wood piles between existing wood piles. Clerk's Papers (CP) at 12. General Construction also agreed to dredge the marina down to a depth of minus ten feet with a one-foot allowance. The agreement stipulated that the project would commence July 16, 2008. The agreed price was in excess of $800,000.

General Construction began dredging in July 2008, but it encountered difficulties and could not dredge to the required minus 10-foot depth. General Construction told McGuire that it was experiencing resistance "in hardpan" and was unable to dredge the north and south ends of the marina. Verbatim Report of Proceedings (VRP) at 281. McGuire paid General Construction $615,000 for its work to date.

2

Concerned that General Construction had not completed its work in some areas, McGuire hired Wilson & Associates to survey the area. The survey revealed that General Construction had not properly dredged the area: For example, under three boathouses in the north end, there was still material that needed dredging. The south end of the moorage basin was not fully dredged. And the boathouses on the eastern end appeared to have shifted eastward. The survey also revealed that although General Construction was supposed to have dredged 12,800 cubic yards of material, it had dredged only about 7,000 cubic yards.

Finishing the project required taking the marina apart and "starting over"; it involved such work as re-wiring, removing material underwater, pumping sediment onto the shore, removing and replacing pilings at the north and south ends of the marina, re-wiring the facility, and potentially obtaining a new permit. VRP at 319. McGuire's attempt to have General Construction finish the dredging failed. So McGuire contacted other marine construction companies and sought price estimates for finishing the dredging: McGuire contacted Frank Immel at Global Divers about the cost of removing underwater material and pumping sediment on shore. McGuire contacted Thompson Pile Driving about removing the pilings. And he contacted Sound Rock and Bulkhead about dredging the material that General Construction had failed to dredge and refused to complete.

## II. PROCEDURE

On May 19, 2011, Day Island sued General Construction for breach of contract, alleging that (1) General Construction had breached its duty to perform dredging and marina operations in accordance with their written agreement; and (2) as a result of this breach, Day Island was entitled to specific performance or damages. General Construction responded with a set of

interrogatories asking Day Island to list specific damages, which it did. There was a jury trial in October 2012.

### A. Trial Testimony

#### 1. Day Island's witnesses

Jeffrey Layton, a coastal civil engineer with Layton & Sell, had worked as an engineer with General Construction since 1977. In 2002, McGuire had contacted Layton to help with permitting for the Day Island project. Layton testified that the main dispute between McGuire and General Construction involved the south area of Day Island and the diagonal boathouses. The plan was for General Construction (1) to dig out a small area around the south end to allow material to flow down the channel into the marina before dredging underneath the boathouse, (2) to remove the boathouses in the basin and to store them offshore, and (3) then to return the boathouses to their original positions. But General Construction did not move all the boathouses.

McGuire testified about the agreement into which Day Island had entered with General Construction. He stated that General Construction had failed to dredge 200 to 250 cubic yards at the north end of the marina and 250 cubic yards at the south end. McGuire had first noticed a problem before General Construction left the site in September 2008; and he had complained to Tom Jirava, General Construction's employee in charge of site operations, that General Construction had not completed dredging the south and north ends. In September 2008, McGuire contacted General Construction, asking it to complete the promised dredging; General Construction refused. Nor did General Construction assist McGuire to fix the problems its incomplete dredging had caused. Instead, General Construction told McGuire to contact Frank

Immel and to hire a diver to "suck the mud up and put it up on [the] property," which would have cost over $500,000. VRP at 308.

McGuire had been unable to find another contractor to "fix" General Construction's failure to dredge the north and south ends of the marina and its failure to move the boathouses, without first taking the marina apart and starting over. VRP at 318. The cost of rebuilding the marina, including rewiring, would be at least $1.9 million, the amount McGuire had already spent on the project. When McGuire's counsel asked if he had an opinion about how much the value of the marina had dropped as a result of General Construction's failure to dredge properly, General Construction objected on grounds of lack of foundation and expertise. The trial court overruled the objection, stating that McGuire could answer and that the weight "goes to the jury."

Marty Jackson testified that Day Island had hired him and his former partner John Patterson to work with General Construction to replace the boathouses back into the basin and to secure them in place with pilings. General Construction had to "get certain piling in place" before Jackson and General Construction could bring in the first row of boathouses; General Construction would then install pilings outside the boathouses to secure them before the next row of boathouses could be brought in and secured. Jackson saw General Construction dredge and pile drive using two barges, which Jackson believed were rather large for working in Day Island's small basin, "sort of like a bull in a china shop." General Construction's large barges appeared to have a hard time maneuvering around the docks and pilings inside the basin because clearance was minimal.

## 2. General Construction's Witness

Ken Preston, an estimator and superintendent at General Construction, testified that removing all the material that General Construction had failed to remove would cost about $95,000. Preston had arrived at this figure by calculating the total number of yards of material that still needed to be removed (500) divided by the yards that could be removed per day (30), which would take about 2 weeks at a cost of $5200 a day as quoted by Immel at Global Diving. The cost of "mob[ilizing] and demob[ilizing]" would be about $15,000.[1] VRP at 567.

## B. Jury Instructions[2]

The trial court instructed the jury to determine (1) whether General Construction had breached its contract with Day Island; (2) whether Day Island had sustained damages as a result of General Construction's breach; and (3) the amount of damages, if any, Day Island had sustained. On the specific issue of determining damages, the jury instructions stated that if the jury found Day Island proved that it had incurred actual damages and if the jury determined the amount of such actual damages, then the jury should award actual damages to Day Island. Jury instruction 10 also specified that in calculating damages, the jury should determine the "sum of money that will put the plaintiff [Day Island] in as good a position as it would have been in if both plaintiff and defendant had performed all of their promises under the contract." CP at 168.

---

[1] Mobilization is the preliminary process and cost of starting a dredging project before the actual dredging takes place: It includes towing the equipment to the site and preparing the equipment and barges. Demobilization involves offloading and removing this equipment from the site after the work is completed.

[2] General Construction did not challenge the jury instructions below. Nor does it challenge them on appeal.

## C. Closing Arguments

Day Island argued to the jury that (1) to repair the marina, Global Diving would charge about $500,000 and General Construction would charge about $200,000 to pull the pilings; and (2) the property value had dropped to about 60 to 80 percent of the amount paid for the dredging operation, $1.14 million and $1.52 million, respectively. Day Island also told the jury that the measure of damages was to "put Mr. McGuire back in as good a position as he would be if he hadn't met these guys," and that "[McGuire] spent a million-nine figuring this marina was going to be turnkey to pass on to his next generation. Instead, he has a mess. I would like to have him see the million-nine back and start all over." VRP at 896.

General Construction argued that to show damages, Day Island had to "prove by a preponderance of evidence the breach of contract and that they were damaged," but "[t]hey didn't really produce any damage evidence," and Day Island's damages did not amount to "a million five" because, based on Preston's testimony, the cost to move the boathouses and to remove the remaining material out was only $95,000. VRP at 879.

## D. Verdict; Judgment

The jury entered a special verdict finding that (1) General Construction had breached its contract with Day island to furnish the necessary personnel, equipment, and facilities to accomplish the dredging and associated float and marina repair at Day Island Yacht Harbor; (2) as a result of General Construction's breach of contract, Day Island had sustained damages; and (3) the amount of these damages was $1,250,000. The trial court entered judgment on November 2, 2012, awarding Day Island $1,250,000 in damages, plus costs and disbursements set forth in its costs bills. The trial court denied Day Island's request for attorney fees or litigation expenses.

## E. Motion for New Trial

General Construction moved for a new trial and/or remittur on grounds that (1) Day Island did not provide sufficient evidence to support the jury's verdict, and a new trial was warranted under CR 59(a)(7); (2) McGuire's testimony was inadmissible and the trial court's admission of his testimony constituted an error of law under CR 59(a)(8); and (3) the verdict did not "do substantial justice," which warranted a new trial under CR 59(a)(9). CP at 211.[3] General Construction argued that McGuire's failure to present evidence of the value of Day Island before the alleged damage warranted a new trial. The trial court noted that although General Construction had objected to the specific question about McGuire's opinion on how much the drop in value of the marina was, General Construction did not further object, file a motion to strike, or challenge any subsequent testimony.

The trial court also noted that (1) after the trial court overruled General Construction's objection, McGuire had testified about his opinion of the drop in his marina's value; (2) General Construction had waived its objection to this testimony; and (3) the jury had heard the evidence, rendered a verdict, and used the information presented at trial to reach their verdict. For these reasons, the trial court denied General Construction's motion for new trial and/or remittur.

General Construction appeals.[4]

---

[3] General Construction also argued below that a new trial was warranted under CR 59(a)(6) and CR 59(a)(5). But these grounds are not before us on appeal.

[4] General Construction does not raise the remittur issue on appeal.

ANALYSIS

I. Admission of McGuire's Testimony

General Construction first argues that the trial court erred in admitting McGuire's testimony on damages. More specifically, General Construction contends that (1) McGuire was not qualified to opine about the Day Island marina's diminution in property value as a result of its (General Construction's) breach of contract, and (2) McGuire's testimony was both incompetent and prejudicial because Day Island failed to lay a proper foundation for it. This argument fails.

A. Standard of Review

We review for abuse of discretion a trial court's ruling on the admissibility of opinion evidence. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). It is well settled that an owner is qualified to testify about the value of his property; no further "expert[ise]" is required. *See McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 468–69, 413 P.2d 617 (1966); *Wicklund v. Allraum*, 122 Wn. 546, 547–48, 211 P. 760 (1922); *State v. Hammond*, 6 Wn. App. 459, 462, 493 P.2d 1249 (1972).

A property owner is presumed to be sufficiently acquainted with its value and the value of surrounding lands to give an intelligent estimate of the value of his property. *State v. Wilson*, 6 Wn. App. 443, 451, 493 P.2d 1252 (1972). An owner's knowledge about the value of his property may come from many sources, including inquiries, comparisons, purchases, and sales. *Wicklund*, 122 Wn. at 547. The source of the property owner's knowledge may affect the weight of his testimony but not its admissibility. *Wicklund*, 122 Wn. at 547; *McInnis & Co. v. W.*

*Tractor Equip. Co.*, 67 Wn.2d 965, 968, 970, 410 P.2d 908 (1966).

## B. Admissibility

It is undisputed that McGuire was the owner of Day Island Yacht Harbor, Inc. General Construction challenges the proposition that a real property owner can testify about its value, based on *Wicklund*'s and *McPhee*'s focus on personal property, not real property. But General Construction ignores that Washington courts have extended this long-established personal property value rule to real property. *See State ex rel. Bremerton Bridge Co. v. Superior Court for Kitsap Cnty.*, 194 Wn. 196, 198-99, 77 P.2d 800 (1938). Furthermore, a key case that General Construction cites, *State v. Wilson*, 6 Wn. App. 443, 493 P.2d 1253 (1972), stands for the very proposition that it contests here, namely that "the owner of real property has a right to testify as to the value of his property." *Wilson*, 6 Wn. App. at 451. We hold that the trial court did not abuse its discretion in allowing McGuire to testify about the value of his property.

General Construction also argues that the trial court improperly admitted McGuire's testimony under *Wilson*, in which we ruled that an owner's testimony about the fair market value of his real property becomes incompetent when it is based on irrelevant factors and ignores relevant factors. This argument also fails because *Wilson* is distinguishable. In *Wilson*, we held that (1) evidence of the cost of reproducing or replacing a building is admissible when the structures are well adapted to the land on which they stand; (2) such reproduction cost is not admissible when the sole factor for determining fair market value is based on structures located on "another comparable parcel of realty"; and (3) because the owner's valuation testimony was

10

based solely on the cost of rebuilding structures on a different, but comparable, plot of land, the trial court did not abuse its discretion in excluding such testimony. *Wilson*, 6 Wn. App. at 450-51.

Here, however, McGuire testified about the cost to reconstruct the same buildings at the same place on the same land at his Day Island marina. Thus, our holding in *Wilson*—that the cost of reconstruction on the same plot of land is admissible—supports the trial court's admission of McGuire's testimony here. Through McGuire's testimony and related exhibits, Day Island provided estimates of reconstruction costs on its own marina, not on a comparable plot of land.[5]

We further note that *Wilson* involved appellate review of the trial court's *exclusion* of the property owner Wilson's valuation; here, in contrast, the issue is whether the trial court erred in admitting property owner McGuire's valuation testimony. As we explained in the Standard of Review section of this analysis, we give deference to the trial court's evidentiary rulings, reversing only where in making such rulings, the trial court abused its discretion. We hold that the trial court did not abuse its discretion in admitting the testimony of McGuire, who as Day Island's owner, was qualified as a matter of law to testify about the value of his property, both before and after General Construction's breach of contract, to prove damages.

---

[5] Day Island also provided ample other valuation evidence, including testimony from numerous witnesses, correspondence between the parties, and price estimates from other marine construction companies. In contrast, the record in *Wilson* comprised a short record containing only Dr. Wilson's testimony. *Wilson*, 6 Wn. App. at 444-45.

## II. SUBSTANTIAL EVIDENCE SUPPORTS JURY VERDICT

General Construction next argues that substantial evidence does not support the jury's $1.25 million damages verdict. General Construction asserts that under the diminution in value theory, Day Island failed to provide the fair market value of the marina before and after General Construction's breach of contract. We disagree.

### A. Standard of Review

Courts are reluctant to interfere with a jury's fair damages award. *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 329, 858 P.2d 1054 (1993). Thus, we view the evidence in the light most favorable to the jury's verdict. *State v. Curtiss*, 161 Wn. App. 673, 693, 250 P.3d 496 (2011). And there is a strong presumption that a jury's damages award is correct. RCW 4.76.030, *Green v. McAllister*, 103 Wn. App. 452, 461, 14 P.3d 795 (2000).

Nevertheless, an appellate court may overturn a jury's damages award that is "outside the range of substantial evidence in the record." *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985). Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "'Evidence of damage is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture.'" *Clayton v. Wilson*, 168 Wn.2d 57, 72, 227 P.3d 278 (2010) (quoting *State v. Mark*, 36 Wn. App. 428, 434, 675 P.2d 1250 (1984)).

### B. Breach of Contract Construction Damages

For determining construction damages, our State Supreme Court has adopted the Restatement (Second) of Contracts § 348, at 119-20, which provides, in pertinent part:

> (1) If a breach delays the use of property and the loss in value to the injured party is not proved with reasonable certainty, he may recover damages based on the rental value of the property or on interest on the value of the property.
> (2) If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on
> (a) the *diminution in the market price of the property caused by the breach*, or
> (b) the *reasonable cost of completing performance or of remedying the defects* if that cost is not clearly disproportionate to the probable loss in value to him.

*Eastlake Construction v. Hess*, 102 Wn.2d 30, 47-48, 686 P.2d 465 (1984) (emphasis added).

In cases involving breach of contract based on unfinished construction, the plaintiff can prove damages based on the cost to have the work completed by another contractor. *Eastlake*, 102 Wn.2d at 47. If, however, performance was defective instead of unfinished, the plaintiff can recover damages based on the cost to remedy the defects. *Eastlake*, 102 Wn.2d at 48. If the cost to remedy the defects includes the cost of undoing the defective work and if this remedial cost is clearly excessive, damages should reflect the difference between the property's fair market price with and without the defects. *Eastlake*, 102 Wn.2d at 48.

General Construction argues that *Eastlake's* diminution in value theory required the jury to ascertain damages based on the difference between the property's fair market values immediately before and immediately after the damage. *Colella v. King County*, 72 Wn.2d 386, 393, 433 P.2d 154 (1967); *Harkoff v. Whatcom Cnty.*, 40 Wn.2d 147, 241 P.2d 932 (1952).

More specifically, General Construction contends McGuire's testimony—that Day Island Marina's property value declined by about 50 to 70 percent of the $1.9 million total cost of the construction project[6]—was speculative and insufficient to meet Day Island's burden of proof and did not support the jury's $1.25 million damages verdict. We disagree.

Under *Eastlake*, the diminution in value theory is not the sole method for calculating damages; rather, the parties can also base damages on the "reasonable cost of completing performance or of remedying the defects" for defective or unfinished construction. *Eastlake*, 102 Wn.2d at 47. Furthermore, the instructions here did not direct the jury to use the diminution in value theory; instead, the instructions directed the jury to determine the sum of money that would put Day Island in as good a position as it would have been if both Day Island and General Construction had performed all their promises under the contract.[7] Moreover, neither party

---

[6] The original $615,000 contract between General Construction and Day Island was part of the total "project costs." *See* 3 VRP at 658.

[7] *See, e.g.*, Jury Instruction 10, derived from WPIC 303.01,which provided, in pertinent part:
    In order to recover actual damages, the plaintiff has the burden of proving that the defendant breached a contract with it, and that plaintiff incurred actual economic damages as a result of the defendant's breach, and the amount of those damages.
    If your verdict is for plaintiff on plaintiff's breach of contract claim and if you find that *plaintiff has proved that it incurred actual damages* and the amount of those actual damages, then you shall award actual damages to the plaintiff.
    Actual damages are those *losses that were reasonably foreseeable*, at the time the contract was made, as a probable result of a breach. A loss may be foreseeable as a probable result of a breach because it follows from the breach either (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.
    In calculating the plaintiff's actual damages, you should determine the sum of *money that will put the plaintiff in as good a position as it would have*

articulated the diminution in value theory during closing argument.[8]   Accordingly, General Construction's assertion that Day Island was required to prove damages under the diminution in value theory fails.

We turn instead to the substantial evidence that supported the jury's $1.25 million damages verdict. McGuire testified that (1) "fix[ing] the marina" involved re-wiring, which alone would cost about a quarter million dollars; (2) he had spent $1.9 million fixing the marina; (3) there was no other way to "fix" the marina without taking it apart and starting over; (4) the value of the marina probably dropped by about 60 to 80 percent as a result of General Construction's breach; (5) part of "fixing" the marina involved hiring a diver to "suck the mud up" that General Construction had failed to dredge at the north and south ends of the marina and pump this mud on to shore, which cost about $500,000, VRP at 308, 319; and (6) he (McGuire) had already paid General Construction $615,000 for its work, most of which had to be removed

---

*been in* if both plaintiff and defendant had performed all of their promises under the contract.

The burden of proving damages rests with the plaintiff and it is for you to determine, based upon the evidence, whether any particular element has been proved by a preponderance of the evidence. You must be governed by your own judgment, by the evidence in the case, and by these instructions, rather than by speculation, guess, or conjecture.

CP at 168, (emphasis added).  General Construction concedes that "WPI 303.01 correctly instructed that plaintiff could recover all 'reasonably foreseeable' and 'actual economic damages [suffered] as a result of breach.'" Br. of Appellant at 36.

[8] General Construction argued that Day Island (1) had to prove by a preponderance of evidence the breach of contract and the damages it suffered as a result, and (2) "didn't really produce any damage evidence." VRP at 879. Day Island referenced McGuire's testimony about the drop in the property's value to show the extent of damages: "We can't tell you what it would cost because there are too darn many problems involved. It is a mess. So we gave you our best opinion as to what this has done to our property value. 60 to 80 percent of what he spent." VRP at 894.

and redone at additional cost to Day Island because General Construction refused to repair the damage it had caused. Frank Immel's emailed price quote for a dive operation to remove the mud included: $3,120 for an initial investigative dive to assess the project better, an estimated $84,000 for "mob[ilization] and demob[ilization]," and $7,960 per day for repair costs. CP at 313. We hold that there was substantial evidence presented at trial to support the jury's verdict of $1.25 million.

### III. MOTION FOR NEW TRIAL

Finally, General Construction argues that the trial court abused its discretion in denying its (General Construction's) motion for a new trial because (1) the trial court erroneously admitted McGuire's testimony, (2) the trial court improperly ruled that General Construction had waived its objections to McGuire's testimony, (3) substantial evidence did not support the jury's verdict, and (4) the verdict "does not do substantial justice." Br. of Appellant at 37. Again, General Construction's argument fails.

### A. Standard of Review

It is well settled that granting or denying a motion for a new trial is directed to the considerable sound discretion of the trial court. *Coats v. Lee & Eastes, Inc.*, 51 Wn.2d 542, 552, 320 P.2d 292 (1958). And we will not intervene with the trial court's new trial decision absent a manifest abuse of that discretion. *Coats*, 51 Wn.2d at 552. A trial court abuses its discretion when it fails to grant a new trial or amend a judgment where the damage award is contrary to the evidence. *Locke v. City of Seattle*, 162 Wn.2d 474, 486, 172 P.3d 705 (2007). The test for an abuse of discretion is whether no reasonable judge would have reached the same conclusion. *In*

*re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985). We find no such abuse of discretion here.

We have already held that the trial court did not abuse its discretion in admitting McGuire's testimony and that substantial evidence supports the jury's verdict. Thus, there remain two "new" arguments to address in the new trial context: whether the trial court properly ruled that General Construction waived its objection to McGuire's testimony and whether the jury's verdict did "substantial justice." Br. of Appellant at 37. We address each in turn.

## B. Waiver

General Construction argues that in considering its motion for a new trial, the trial court erroneously ruled that (1) it (General Construction) had waived its right to challenge McGuire's testimony about the value of his marina; and (2) because the jury already heard the challenged evidence, General Construction should have mounted an additional objection, a motion to strike or a CR 50 motion for a directed verdict. Because General Construction provides no legal authority to support its assertions, contrary to RAP 10.3(a)(6), we do not further consider this argument. Moreover, as we note above, we have already held that the trial court did not abuse its discretion in admitting McGuire's testimony.

## C. Jury's Verdict

General Construction argues that the trial court erred in not granting a new trial because the jury's verdict did not do "substantial justice." Br. of Appellant at 37. As we have also previously explained, appellate courts are generally reluctant to interfere with a jury's damage award because the determination of damages is within the province of the jury. *Palmer v. Jensen*, 132 Wn.2d 193, 197, 937 P.2d 597 (1997). We examine the record to determine whether

17

the jury's award is contrary to the evidence. *Palmer*, 132 Wn.2d at 197. Where the jury could believe or disbelieve the evidence and weigh all of it and remain within the range of the evidence in returning the challenged verdict, then it cannot be found as a matter of law that the verdict was unmistakably excessive or inadequate to show that the jury was motivated by passion or prejudice based on the amount. *James v. Robeck*, 79 Wn.2d 864, 870-71, 490 P.2d 878 (1971). If the verdict falls within a range of proven damages, it should not be set aside as excessive. *James*, 79 Wn.2d at 870-71.

CR 59(a)(9) provides that a motion for new trial *may* be granted if "substantial justice has not been done." But courts rarely grant a new trial for lack of substantial justice under CR 59(a)(9) because of the other grounds afforded under this rule. *Lian v. Stalick*, 106 Wn. App. 811, 825, 25 P.3d 467 (2001). Moreover, contrary to RAP 10.3(a)(6), General Construction provides no authority or citation to the record in support of its argument that "substantial justice has not been done"; instead, it states, "[S]ee prior argument," without referring to any specific prior argument. Therefore, we do not further consider General Construction's "substantial justice" argument. Br. of Appellant at 37.

In light of the substantial supporting evidence that we have already set forth in an earlier section of this analysis, we hold that the jury's award of $1.25 million to Day Island was not "unmistakably [] excessive" so as to warrant a new trial. *James*, 79 Wn.2d at 870-71. We further hold that the trial court did not abuse its discretion in denying General Construction's motion for a new trial.

No. 44402-0-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Hunt, J._

Hunt, P.J.

We concur:

_Worswick, J._

Worswick, J.

_Melnick, J._

Melnick, J.